IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KELVIN McCLEARN #314-040           *
          Petitioner
      v.                           *   CIVIL ACTION NO. WDQ-06-1557

KATHLEEN S. GREEN, WARDEN, et al.  *
          Respondents.

                        ******

## MEMORANDUM

Before the Court is the pro se Petition for Writ of Habeas Corpus filed by Maryland prisoner Kelvin McClearn (Paper No. 1), the State's Answer and exhibits filed in response thereto (Paper No. 13), and McClearn's reply in support of the petition. (Paper No. 16). After reviewing these papers, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts; *see also* 28 U.S.C. § 2254(e)(2). For reasons set forth below, the Court denies relief and dismisses the Petition with prejudice.

## Procedural History

On July 2, 1999, McClearn was arraigned following indictment in the Circuit Court for Prince George's County for the stabbing death of his brother. (Paper No. 13, Exhibit 1 at 1 and Exhibit 7 at 1). McClearn waived a jury trial and on April 23, 2001, was convicted of second degree murder and carrying a concealed and dangerous weapon. (*Id.*, Exhibits 1 and 18). On direct appeal, McClearn argued that the trial court failed to comply with the waiver of counsel requirements of Maryland Rule 4-215 and the suppression court erred in finding that his pre-*Miranda*[1] statements did not taint his post-*Miranda* statements. (*Id.*, Exhibit 18 at 1). In an unreported opinion filed on July 22, 2002, the Court of Special Appeals of Maryland reversed

---

[1]    *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).

McClearn's convictions because his waiver of counsel was defective under Maryland Rule 4-215. (*Id*.).

On March 10, 2003, McClearn against the advice of counsel waived his right to trial by jury. (*Id*., Exhibit 2 at 2-5).   After two days of trial, the trial court rejected McClearn's theory of self-defense and convicted him of second-degree murder.  (*Id*., Exhibit 3 at 33-36).  A thirty-year term of incarceration was thereafter imposed.  (*Id*., Exhibit 4 at 27).

The facts adduced at trial, recounted by the appellate court, follow:

At approximately 5:00 p.m. on Sunday, May 16, 1999, Corporal Paul Person of the Prince George's County Police Department was dispatched to 2716 Sansbury Road in Upper Marlboro in response to an alleged "cutting" in the backyard of the residence.  Person was informed by the dispatcher that the caller, appellant, had indicated that there had been an altercation in which he had killed his brother.

When Person arrived at the scene, Officer Gary Brown and paramedics already had arrived.  Appellant, then age forty-two, six feet, 2 inches tall, and weighing 175 pounds, was in the backyard of the property, handcuffed.  He was "covered in blood from head to toe."  There was "blood on his clothes, his arms, his head, his pants....He had a cut to his head and a couple scratches on his arms."  The victim, Avan McClearn...age thirty-nine, six feet, one inch tall, and weighing 234 pounds, was lying in the back yard next to a white trailer used by the household for the storage of miscellaneous items, including old construction equipment.  Avan was pronounced dead at the scene.

Officer Brown testified that, upon his arrival, he observed appellant, "Covered in blood standing outside near a tree with a knife in his hand[.]"  Brown directed appellant to place the knife on the ground and then arrested him. Brown said appellant "seemed as though he was in shock or had been on some type of medication, or drugs, or something that caused him to be a little bit out of it."  Nevertheless, appellant was cooperative.  Brown noticed several lacerations on appellant's face, and scars above his left eye and above his right thigh.  Appellant reported that Avan had hit him with a pipe and that, thereafter, appellant "pulled his knife out, and began to try to cut him and stab him."  When questioned by the court regarding whether a metal pipe was found on the property, Corporal Brown answered that there was not one found "in the vicinity," although there were a number of things in the shed that could have fit that description.

Appellant told Person that the altercation had started as a fistfight, but that Avan then hit him over the head and in his face with a piece of metal pipe. It was only at this point that appellant drew his knife, which he carried in a sheath at his waist, and began stabbing Avan numerous times.  The knife was recovered at the scene, lying on top of a black hat next to a tree.

* * * *

In an interview room at the homicide unit's offices, Detective Nelson Rhone took appellant's oral and written statements.  After appellant had waived his rights, he told Rhone

"that h[e] and his brother were out back smoking some...crack cocaine, which he described.  He said during that time, they both engaged in CDS for a little while which his brother had smoked up all the CDS.

"Briefly, he had separated from his brother and went inside to get a drink of water, came back outside, and then was wanting to reengage in smoking additional CDS.  When he got mad and found out his brother had smoked up all the crack cocaine, they became involved in a brief verbal altercation.  Then subsequently became involved in a physical altercation where he said he pulled his knife and stabbed his brother repeatedly."

In his written statement, appellant stated that he and Avan were in the backyard smoking crack cocaine.  Avan became angry with appellant when appellant suggested that they should "throw the rest of the drug away."  Avan loaded the remaining cocaine into a glass pipe and began to smoke it.  Upon appellant's second attempt to "disregard" the remaining cocaine by reaching for the drugs, Avan shoved him against the trailer.  It was during the ensuing physical altercation that appellant took his knife and stabbed Avan repeatedly.

* * * *

When appellant had completed his written statement, the police took him to the emergency room at Prince George's Hospital Center.  The findings of his physical examination were a one centimeter laceration on his forehead midway between the brown of the left eye and the hairline and a superficial, non-penetrating human bite mark on the interior aspect of the left biceps.

Mary G. Ripple, M.D., a Deputy Chief Medical Examiner, testified to the autopsy findings.  She explained the difference between a stab wound and a "cutting."  A "stab wound is deeper in the body than it is long in the skin, and a cutting wound is longer in the skin than the depth within the body."  The conclusions

of the autopsy were that Avan had

>"died of multiple stab (15) and cutting (41) wounds.  There were eight (8) stab wounds on the front of the left side of the chest that injured the heart, left lung, liver and the interior vena cava (a large blood vessel).  There was a stab wound (1) on the lateral aspect of the left side of the back that injured the left lung and diaphragm (breathing muscle).  A stab wound (1) to the left upper quadrant of the abdomen injured the stomach and abdominal soft tissue.  The remaining stab and cutting wounds did not injure any vital structures.

>"The stab and cutting wounds on the left forearm and the cutting wounds on the hands are consistent with defensive posturing on the part of the deceased."

Avan tested positive for cocaine and its metabolites, but negative for alcohol.  Dr. Ripple testified that cocaine

>"can be associated with agitated-type behavior.  Aggression is associated with verbal aggression.  There are instances where people can act aggressive on cocaine.  It is usually the permanent disorder or the person's aggressive nature that usually outweighs the actual effect of the drug itself."

Due to the amount of cocaine in his blood, and its level of breakdown into metabolites, Dr. Ripple opined that Avan had "most likely" been doing cocaine for several hours.*

Dr. Ripple doubted that Avan "would have been conscious for more than a couple minutes" after the three severe stab wounds to his heart.

Appellant took the stand in his own defense.  He testified that he had been asking Avan repeatedly for a ride to a shopping center.  Appellant said that Avan had been smoking crack cocaine throughout that afternoon. The altercation started when appellant suggested that Avan had consumed enough cocaine and asked Avan for the keys to his car.  Avan became agitated, and appellant "swiped at the little bit [of cocaine] remaining.  Avan shoved appellant, and appellant pushed back.  The two fell to the ground, and Avan struck appellant numerous times in the head.

Eventually, when Avan caught appellant in a choke hold, and appellant

_____

\*     The record is silent as to biochemical evidence of cocaine use by appellant.

experienced problems breathing, appellant reached down and unsheathed his knife, jabbing it at Avan's arm.  Appellant testified that he pulled out his knife only in order to "unleashed [Avan's] arm around my neck."

The two fought over control of the knife.  Avan struck appellant with an automobile tire jack handle, and appellant stabbed Avan in the chest with the knife.  Thereafter, Avan stopped fighting.

According to appellant, he was hit with the jack handle once in the temple and "upside over [his] back" as hard as Avan could hit.  Avan also was said to have hit appellant three times with a four pound metal brake pad, above his left eye, on the top of his head, and above his right temple.  Appellant also said he was hit with a metal drain pipe, which was stuck in his back until "someone removed it."  This injury did not appear on the hospital emergency room report, he explained, because the police would not remove the handcuffs behind his back while he was being examined.  Appellant denied intending to kill Avan or intending to cause permanent injury.  He said that he was unable to get away from Avan and that the stabbing was a reaction to Avan's provocation.

During his confinement on the subject charges, appellant wrote a number of letters directly to the court, in which he gave various descriptions of the way in which the homicide had come about.  These were utilized by the State in its cross-examination of appellant.  In one of these letters appellant gave the following description of how the fatal wounds were inflicted.

"While I was straining to get the knife back from him with his opposite hand, I noted he was reaching for a larger object to use against me, that's when I used both of my hands to pry the knife from him, then I slung the knife up toward his neck.  When I caught sight of how seriously damaged his neck was, I cried out, [']Avan, let's stop it now.  Let's stop now.  Let me go.['] He was steadily wrestling with me.  His words were, [']come on, let's do it.['] I felt something heavy hit against the side of my neck and shoulder, and it did seem that Avan had gained a surge of strength to fight longer.  He had me on my back.  At that instant I was then standing [sic] up at him.  I stabbed at his arm and left side.

"All of a sudden I heard him take a deep breath, and he said, [']oh, no.['] He laid down on his back and said, [']you're my brother.['] I held him an instant.  Then I rushed out to seek for help."

In its summation the State argued that police photographs of the interior of the trailer did not show a jack handle, a brake shoe, or a shattered twenty-five pound ceramic light fixture with which appellant also claimed to have been hit in one of his descriptions of the struggle.

(Paper No. 13, Exhibit 7 at 1-8).

On direct appeal, McClearn argued that the trial court erred in (1) admitting into evidence the transcript of Detective Rhone's prior testimony on the ground that he was "unavailable;" (2) shifting the burden of persuasion to McClearn to prove self-defense; and (3) failing to consider whether a legally adequate provocation mitigated murder to manslaughter. (*Id.*, Exhibit 5 at 2). In an unreported opinion filed on June 25, 2004, the Court of Special Appeals affirmed the judgment of the trial court.[2] McClearn sought certiorari to the Court of Appeals of Maryland, raising the same appellate arguments as well as other issues which were not raised on direct appeal. (*Id.*, Exhibit 8). On October 8, 2004, the Court of Appeals denied the request for further review. (*Id.*, Exhibit 9).

On June 21, 2004, McClearn initiated post-conviction proceedings in the Circuit Court for Prince George's County. (*Id.*, Exhibit 10) McClearn's claims, as supplemented, were as follows: (1) ineffective assistance of counsel; (2) trial court error; (3) denial of the right to counsel; (4) the State did not comply with discovery; (5) his speedy trial rights were violated; and (5) the evidence was insufficient to sustain the convictions. (*Id.*, Exhibits 10-12). McClearn and trial counsel testified at a March 9, 2006, hearing. (*Id.*, Exhibit 14). On March 16, 2006, the post-conviction court denied relief on all grounds raised. (*Id.*, Exhibit 15).

McClearn sought leave to appeal the post-conviction court decision, raising claims that: (1) trial counsel was ineffective for failing to file a motion for modification of sentence; (2) the trial court failed to "scrutinize" bags of evidence placed at the prosecutor's table prior to the testimony of Corporal Robert Taylor; (3) trial counsel was ineffective in his presentation of McClean's claim

---

[2]     The mandate issued on July 26, 2004. *Id.*, Exhibit 7.

of self-defense; (4) McClearn's right to a speedy trial was violated; (5) the State committed a *Brady*[3]

violation by failing to disclose certain evidence; and (6) the trial court acted unethically by rendering

a guilty verdict.  (*Id*., Exhibit 16).  On June 25, 2006, the Court of Special Appeals of Maryland

summarily denied McClearn's application for leave to appeal.  (*Id*., Exhibit 17).

McClearn now raises the following claims in support of his federal habeas corpus petition:

(1)     He was denied effective assistance of trial counsel where counsel failed to
        effectively present his claim of self-defense;

(2)     The State violated *Brady v. Maryland* by failing to disclose certain "bags"
        of evidence;

(3)     The trial court violated ethical standards by finding him guilty of second
        degree murder; and

(4)     He was denied his constitutional right to a speedy trial.

(Paper No. 1, Grounds One through Four).

## Threshold Considerations

### Timeliness

The Court already has determined that the Petition was filed within the one-year limitations

period set forth at 28 U.S.C. 2244(d)(1).

### Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), those petitioning for federal habeas corpus relief

must first exhaust each claim by pursuing remedies available in state court.  This exhaustion

requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction

to consider the claim.  *See* 28 U.S.C. § 2254(b)-( c); *see also O'Sullivan v. Boerckel*, 526 U.S. 838,

---

[3]        *See Brady v. Maryland*, 373 U.S. 83 (1963).

848 (1999); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).  In Maryland, this may be

accomplished by proceeding with certain claims on direct appeal (and thereafter seeking *certiorari*

to the Court of Appeals) and with other claims by way of  a post-conviction petition, followed by

petitioning the Court of Special Appeals for leave to appeal.

McClearn no longer has any state direct review or collateral review remedies available to

him with respect to the claims raised in this Court.  For this reason, his claims will be considered

exhausted for the purpose of federal habeas corpus review.

**Procedural Default**

Respondents contend that McClearn's third claim alleging ethical violations by the trial court

and his fourth claim concerning an alleged speedy trial violation should be rejected on procedural

default grounds.  The Court concurs.

The procedural default doctrine ensures that "state courts have had the first opportunity to

hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor*, 404 U.S.

270, 276 (1971).  In *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Supreme Court held that

consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state

procedural rules, unless the petitioner makes a showing of cause for the failure and prejudice

resulting from the failure. In *Harris v. Reed,* 489 U.S. 255, 267 (1989), the Court emphasized that

a federal court has the responsibility to determine whether a state court in fact based its denial of

relief on procedural grounds.  In *Teague v. Lane*, 489 U.S. 288, 299 (1989), however, the Court

determined that the rule announced in *Harris v. Reed* assumes that a state court has had the

opportunity to address a claim that is later raised in a federal habeas proceeding. *See id***.**  at 299.

Thus, claims which have never been presented in the state courts--or claims which were not

exhausted properly in the state courts--are procedurally defaulted if presentation of the claims in state court would be barred by state procedural rules.  *See Johnson v. Maryland*, 915 F.2d 892, 895 (4th Cir. 1990).

The post-conviction court examined what McClearn now raises as his third claim, and found that:

> [w]ith regard to your specific attack on the verdict, that [the trial judge] did not consider all of the factors for self-defense, that his verdict itself somehow violated rules of ethics, and that the verdict itself showed extreme prejudice to you...those are matters for the [a]ppellate [c]ourt's review as to whether or not there was sufficient evidence to support the conviction. And that...would be something that was either waived as not raised in the appeal, or considered by the [a]ppellate [c]ourt and, therefore, moot....

(Paper No. 13, Exhibit 14 at 70-71).  Similarly, the post-conviction court found McClearn's speedy trial claim to be waived because it could have been raised on appeal following the first trial, and was not.  (*Id.*, Exhibit 15 at 9).

Based on the post-conviction court's findings and the record now before this Court, McClearn's third and fourth claims are procedurally defaulted.  This finding, however, does not end the analysis, because this Court may consider the merits of procedurally defaulted claims if McClearn shows either (1) cause for the procedural default and actual prejudice arising out of the violation of federal law, *see Wainwright,* 433 U.S. at 87, or (2) a resulting fundamental miscarriage of justice if the federal court does not consider the claims.  *See Gray v. Netherland*, 518 U.S. 152, 160 (1996);  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Petitioner has failed to establish any legally sufficient basis showing cause and prejudice for procedural default.  Nonetheless, this Court must still consider whether it should reach the merits of his claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S.

298, 299 (1995).  The miscarriage of justice standard is directly linked to innocence.  *Id***.** at 320.

Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must

pass before a court may consider constitutional claims which are defaulted.  *Id*. at 320.   The

miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has

probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*,  477 U.S.

478, 496 (1986); *Schlup*, 513 U.S. at 320.  To meet this standard Petitioner must show it is more

likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Id*.

*Schlup* observes that:

> a substantial claim that constitutional error has caused the conviction of an
> innocent person is extremely rare . . . To be credible, such a claim requires
> petitioner to support his allegations of constitutional error with new reliable
> evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness
> accounts, or critical physical  evidence--that was not presented at trial**.**

*Id*. at 865; *see also House v. Bell*, 126 S.Ct. 2064, 2077-78 (2006).

Petitioner has failed to present such evidence, and review of the record does not suggest that

it exists.  Petitioner has failed to overcome the procedural bar, and Claims 3 and 4 are procedurally

defaulted and therefore foreclosed from federal habeas review.

## Standard of Review

Because this Petition was filed after April 24, 1996, it is to be decided under amendments

to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act

("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377,

380 n.3 (4ᵗʰ Cir. 2001).   AEDPA modified the federal court's role in habeas proceedings in order

to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent

possible under law.  *See Bell v. Cone*, 535 U.S. 685, 693 (2002).  Pursuant to statute, a federal court

may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> 2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

     A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).[4] Section 2254(d) also requires federal courts to give great deference to a state court's factual findings. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. Petitioner has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

### Analysis of Petitioner's Undefaulted Claims

---

[4]      Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

### Ineffective Assistance of Trial Counsel

Claims of ineffective assistance of counsel are evaluated under the standard set forth in *Strickland  v. Washington*, 466 U.S. 668 (1984).  A convicted defendant must demonstrate that counsel's performance (1) "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant.  *Id*. at 688, 692.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.  The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

 In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688.   In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotations omitted).  A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable.  *See id*. at 690.

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694.   Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable

or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

In his first claim, McClearn contends that trial counsel failed to effectively present his claim of self-defense.  Specifically, he alleges that counsel failed to support his self-defense claim by introducing a photograph depicting the injury he sustained during the altercation with his brother. He further alleges that counsel should have argued that his brother's injuries were not "defensive wounds" as described by the State's expert witness, Deputy Chief Medical Examiner Mary G. Ripple, M.D.  He contends that counsel should have examined and introduced into evidence the bag of bloody clothing worn by him and the victim, and should have challenged the chain of custody of the victim's body by introducing paperwork prepared by the paramedics present at the crime scene.

Maryland recognizes a defense of "complete" self-defense, and a lesser form referred to as "imperfect" or "partial" self-defense.  Perfect self-defense is a complete defense to a charge of criminal homicide, constitutes a justification for the killing, and, if credited by the trier of fact, results in an acquittal.  *See State v. Marr*, 362 Md. 467, 472, 765 A.2d 645, 647 (Md. 2001).  The elements of perfect self-defense are that: (1) the accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant; (2) the accused must have in fact believed himself in this danger; (3) the accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and (4) the force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.[5]

The prospect of imperfect self-defense arises when "the actual, subjective belief on the part

---

[5]       *See State v. Faulkner*, 301 Md. 482, 500, 483 A.2d 759, 768-69 (Md. 1984); *Dykes v. State*, 319 Md. 206, 211, 571 A.2d 1251, 1254 (Md. 1990); *Marr*, 362 Md. at 473, 765 A.2d at 648.

of the accused that he or she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief."  What is unreasonable "is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both."[6] Unlike "perfect" or "complete" self-defense, imperfect self-defense does not constitute a justification for the killing and does not warrant an acquittal: its only effect is to negate the element of malice required for a conviction of murder and thus reduces the offense to manslaughter.  Thus, a person who holds the honest subjective belief that he or she was in apparent imminent danger of death or serious bodily harm and that the force used was necessary to meet the danger cannot be found to have acted out of malice.[7]

As noted by the post-conviction court and confirmed by the record, counsel clearly pursued a self-defense and imperfect self-defense strategy at trial, and the trial court "just didn't buy the argument."  (Paper No. 13, Exhibit 15 at 12).  In explaining to McClearn why it was rejecting specific elements of his ineffective assistance claim, the post-conviction court made the following observations:

> ...the issue of the bag of clothing that came in. [Trial counsel] had a very clear recollection about what he thought about the bag of clothing...and why he did not feel it was appropriate to...insist on it being introduced into evidence, nor did he want it really exhibited to the Judge because he said there was a tremendous quantity of blood on it.  He knew that the blood was from

---

[6]      *Marr*, 362 Md. at 473, 765 A.2d at 648.

[7]      As stated in *Burch v. State*, 346 Md. 253, 283, 696 A.2d 443, 458, *cert. denied*, 522 U.S. 1001 (1997) and again in *Marr*, 362 Md. at 474, 765 A.2d at 648, under Maryland law:

> [T]he only substantive difference between the two doctrines, other than their consequences, is that, in perfect self-defense, the defendant's belief that he was in immediate danger of death [or] serious bodily harm or that the force he used was necessary must be objectively reasonable.  In all other aspects, the elements of the two doctrines are the same."

both you and your brother.  There was nothing of an evidentiary value to be gained by exhibiting that clothing to the Judge.  It was not going to be something that he felt would be in your favor to exhibit.

That's what we call a trial tactic.  A strategic decision that the trial attorney makes in order to determine how to proceed and how to present your best defense.  Not all evidence that comes into the courtroom is going to be introduced and seen by the trier of fact.  And the reasons for that is, that the prosecution has to put in the evidence that they believe will build their case, and the [d]efense wants to usually try and prevent some of that very damaging and prejudicial evidence from being shown to the trier of fact, and that's why they make objections and motions and those sorts of things.

\* \* \* \*

And so, what [defense counsel] explained was, that's how he viewed the blood clothing, and that's how he viewed the photograph of you.  And I think he explained very well that because the photograph taken by the paramedics was taken of you after the paramedics had cleaned the blood off of your face and revealed that the actual cut on your forehead was relatively small.

Now, some of us who are familiar with things like that know that if you have a cut on the forehead, because the blood vessels are very close to the surface there, there's going to be a lot of blood that pours out, but it doesn't mean that the cut itself is medically serious.  It may be serious at that moment because it allows blood to flow into your eyes, and as he argued, temporarily blinding you in that situation.  But once it's cleaned up and the blood is gone, and the only cut shown in that photograph is not very big, or deep, and because you were smiling at that point, he felt that photograph could only prejudice your case and not be in your favor – not be considered in your favor in any way.

\* \* \* \*

I believe I've already addressed the issue of the clothing, but just to be clear, you've claimed that there was ineffective assistance of counsel in the issue of the bags of clothing that were brought into the courtroom.

\* \* \* \*

[McClearn]:    No....I never said it was bags of clothing, I said bags of evidence.

[The Court]:    Okay.  That there were bags of evidence brought into the courtroom.  [Defense counsel] has said that he knew those to be bags of clothing worn by

-15-

both you and your brother.  He understands they were not brought into the court-
room in the beginning of the trial, that he believe that those items would not weigh
in your favor, and I've already explained why.  That seems to be a very credible
tactical decision on his part to decide not to pursue the use of that clothing as
evidence.

With regard to the alleged photographs from news cameramen, [defense
counsel] indicated in testimony today that he knew of no such photographs, that
the only photographs he knew of were the ones that he had seen, and we've
already discussed why the one photograph taken of you at the scene was not in
your favor.

\*   \*   \*   \*

You've also suggested that there was an ineffective assistance of counsel...
in the failure to the State to provide all discovery.  And I believe [defense counsel]
made clear that he had, in fact, received all discovery from the State, and the only
things he did not receive in discovery were the actual items of clothing....

(Paper No. 13, Exhibit 15 at 4-14).

The post-conviction court's findings as to the photographs and clothing are supported by the

record and comport with the dictates of *Strickland*.  To the extent that McClearn attempted to

persuade the post-conviction court that the clothing and photographs would show serious injury and

a puncture wound to his back (*id.*, Exhibit 14 at 19, 22-23), the court found counsel's testimony that

such photographs did not exist to be more credible.[8]  (*Id.*, Exhibit 15 at 13-14).  This finding did not

involve an unreasonable application of federal law nor an unreasonable determination of the facts.

Although the post-conviction court does not specifically address McClearn's contention that counsel

failed to argue that the victim's wounds were defensive, the trial transcript establishes that during

the medical examiner's cross-examination, defense counsel brought out the possibility that the

stabbing occurred while the victim had McClearn in a choke hold.  (*Id.*, Exhibit 3 at 153).  The

---

[8]        Indeed, defense counsel testified that McClearn never indicated that his clothing was torn or
punctured.  *Id.*, Exhibit 14 at 49.

transcript also establishes that McClearn engaged in deadly conduct without adequate provocation.

 As noted by the trial judge, the fight started out to be a "common affray" in the trailer, and

> [i]f you look at the defensive wounds that the victim had, that in
> itself speaks volumes. ..{I]f you look at all the blood, you look where the
> body was found, it appeared to me that the victim had been backed into a
> corner.  Then you take a look at that, coupled with the mark, the defensive
> marks to the arm and the hands of the victim, and the finder of fact is required
> to use some common sense, and their every day experiences, if you apply
> that to what the condition of the body was, would certainly indicate that
> the force was far beyond that which was necessary to defend.

(*Id.*, Paper No. 3 at 34-35).   In light of the above, this claim provides no basis for federal habeas

corpus relief.

McClearn's argument that defense counsel should not have waived the "chain of custody"

establishing who handled Avan McClearn's body after it was taken from the crime scene also

provides no basis for relief.  In essence he implied at post-conviction that his brother was still alive

when removed from the premises and that somebody else might be responsible for his subsequent

demise.   (Paper No. 13, Exhibit 14 at 21).  The post-conviction court placed no credence on the

implication and found counsel's decision to waive proof of the chain of custody to be the type of

procedural decision committed to counsel's discretion.  (*Id.*, Exhibit 15 at 18-19).  This finding will

not be overturned here.

### Withholding Evidence

McClearn also asserts that the State violated *Brady v. Maryland*, 373 U.S. 742 (1970) by

failing to disclose "bags of evidence" until the time of trial.  To establish a *Brady* violation,

McClearn must demonstrate that the State suppressed or withheld material evidence favorable to the

defense.  *See United States v. Bagley*, 473 U.S. 667, 674-78 (1985).  As noted by the post-conviction

court, trial counsel "made clear that he had, in fact, received all discovery from the State, and the

only things that he did not receive in discovery were the actual items of clothing...." (*Id*., Exhibit 15 at 14).  As previously noted, trial counsel was aware that the bag contained bloody clothing worn by the victim and McClearn, and had concluded that the clothing did not mitigate or bolster McClearn's claim of self-defense.  This ruling survives scrutiny under 28 U.S.C. § 2254(d) and provides no basis for habeas corpus relief.

For the foregoing reasons, the instant Petition for Habeas Corpus Relief is denied and dismissed.  A separate Order shall be entered accordingly.


February 9, 2007                           _____/s/_____
 Date                                      William D. Quarles, Jr.
                                           United States District Judge